UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | CASE NO. 1:20 CR 290 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Brandon Althof Long, | ) | Memorandum of Opinion and Order |
| Devon Bryce Poland | ) | |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendants' Joint Motion to Suppress (Doc. 34). Also pending is Defendant Brandon Michael Althof Long's Motion to Suppress Items Illegally Seized Without a Warrant (Doc. 35). For the reasons that follow, defendants' joint motion is GRANTED and defendant Long's motion is DENIED.

**FACTS**

The facts are largely taken from the Cleveland Division of Police Intelligence Unit Confidential Intelligence Report submitted as an exhibit at the suppression hearing. Commander

1

Connelly, who testified at the suppression hearing and was present during the events in question, testified that the report is an accurate and truthful account.

According to the Report and Commander Connelly's testimony, on May 30, 2020, a planned protest occurred in downtown Cleveland. The protest turned violent. Extensive looting and other vandalism occurred, and at least three police vehicles were set on fire. As a result, at approximately 7:30 p.m., the Mayor of Cleveland issued a "Proclamation of Civil Emergency (Civil Unrest)." The proclamation included a curfew, which commenced at 8 p.m. The curfew prohibited, among other things, walking, loitering, and motoring on the streets and alleys of a large potion of downtown Cleveland. With regard to law enforcement, the proclamation provided that "all law enforcement agencies...within and without the City of Cleveland are encouraged to assist in preserving the peace."

That evening, Detective Philip Habeeb and Commander Connelly worked undercover as observers in furtherance of riot suppression and intelligence gathering. They were in their unmarked vehicle positioned at the intersection of East 8th Street and Huron Avenue. Rioting and looting were underway in the area. At approximately 11:55 p.m., Detective Habeeb observed a dark SUV parked midway up an alley on East 8th Street. The vehicle was facing the wrong way in the alley. Neither Commander Connelly nor Detective Habeeb could determine whether the SUV was occupied. At this time, they observed a White male wearing a commercial style filter mask walking out from the alley. The male walked in a circular route onto the sidewalk and near the undercover police vehicle.

Given the looting and rioting going on nearby, Commander Connelly and Detective Habeeb determined that investigation was necessary to determine if the vehicle was involved in

2

some type of criminal activity. They observed that the vehicle displayed a Pennsylvania license plate. They radioed in the plate number and requested an owner's description to compare with the male they had observed. At this time, the detectives observed an interior light in the vehicle flash on and then off.

The officers then positioned the police vehicle in the intersection and activated the vehicle's lights and sirens. At this point, the male approached the passenger side of the police vehicle. Detective Habeeb exited the vehicle and the male informed him that he owned the SUV. At this point, Detective Habeeb received information that the male subject was defendant Long. Long indicated that he was looking for his lost wallet.

It was determined that Long should be "detained and identified" as having violated the curfew order. Detective Habeeb ordered Long to stop and place his hands on the wall. A pat down was conducted, but no weapons were found. Detective Habeeb informed Long that he was subject to arrest for violating the curfew order and that he must remain in the "frisk" position. Detective Habeeb asked Long if there were occupants in the SUV and Long informed him that defendant Poland was waiting for Long in the passenger seat. At the suppression hearing, Commander Connelly testified that Long was not free to leave.

As a result of the rioting and looting, no marked units or arrest teams were available to assist Detective Habeeb and Commander Connelly. After several minutes, three additional detectives and one sergeant arrived to provide assistance. Two of the detectives, along with Detective Habeeb, took positions at the rear of the SUV, while Commander Connelly remained at the wall with Long. Detective Habeeb ordered Poland out of the car with his hands in the air. Poland complied. Detective Habeeb then ordered Poland to the rear of the vehicle and conducted

3

a pat down. Detective Habeeb asked Poland whether he had any weapons on him, and Poland responded that he had a knife. Detective Habeeb recovered a folding knife from Poland's person. Poland was also asked whether there were any weapons in the vehicle. Poland responded that there was a knife and a BB gun. Detective Habeeb ordered Poland to walk up to Long's location and place his hands against the wall. Both Long and Poland remained there for the remainder of the incident. The government acknowledged at the suppression hearing that defendants were "in custody" at the time their hands were placed on the back of the wall. Commander Connelly clearly testified that defendants were arrested for curfew violations.

Thereafter, other officers visually inspected the car through its open doors. In plain sight in the front and back seats, officers observed backpacks, a hammer, a bottle of liquor with a pour top, a BB gun resembling a pistol, and a plastic bottle of liquid fire starter.

Officers then advised Long and Poland of their *Miranda* rights. When asked about the bottle of liquor, both Long and Poland indicated that Poland found it on a sidewalk. Long also indicated that he had a Glock .45 caliber pistol in the center compartment of the SUV.

A search of the vehicle was then conducted. The following items were recovered:

- A Glock .45 caliber pistol;
- Wallet containing Long's identification;
- Two cell phones;
- A claw hammer;
- Wallet containing Poland's identification;
- Loaded Glock pistol magazine;
- A bottle of liquid fire starter;

4

- Open bottle of liquid with pour top;

- A large machete and shovel; and

- Miscellaneous items.

In addition, officers located two backpacks in the back seat. One bag, belonging to Poland, contained a can of red paint, a bottle of water, and a bottle of liquid fire starter. The second bag contained an additional Glock .45 caliber pistol magazine loaded with ammunition, a leather belt holster for a handgun, and miscellaneous items.

After collecting the aforementioned items, officers spoke with Long and Poland. Defendants informed the officers that they came to Cleveland from Erie in order to take part in the protests. They left Erie after the looting and rioting began and after the curfew went in to effect. Both defendants indicated that they did not participate in any illegal activities, but only came to video the incidents on their cell phones. Officers also questioned defendants about the liquid fire starter. Defendants indicated that Long uses it to burn debris in his real estate business. Long informed defendants that the pistol remained in the vehicle the entire time.

Due to ongoing criminal activity, including rioting, looting, and shots fired, taking place in the immediate area, a determination was made to confiscate the recovered property and release defendants. Defendants were ordered to return to the SUV and immediately leave the area. They complied.

Thereafter, after conferring with various agencies, officers transferred this case to the Joint Terrorism Task Force for further investigation.

Federal agents obtained an arrest warrant for Long. On June 5, 2020, federal agents and Erie police officers arrived at Long's house in Erie, Pennsylvania to secure Long's arrest.

Special Agent Jennifer Kiesel testified at the suppression hearing and the Court admitted into evidence the report she prepared detailing the arrest. According to SA Kiesel, law enforcement knocked and announced their presence. After answering the door, Long asked if he could secure his dog in a dog crate located in a room on the first floor of the back of Long's residence. Agents allowed Long to secure his dog. In doing so, agents followed Long through a den and into the room with the dog crate. For officer safety, Long entered the room first. Agents followed, Long crated his dog, and agents then arrested Long. SA Kiesel testified that agents "cleared" the room as they entered in order to ensure officer safety. The room was cleared by conducted a visual inspection as the agents entered the room. In doing so, an agent discovered a flamethrower leaning against a wall in the room. The flamethrower is known as a "The Boring Company It's Not a Flamethrower." It is undisputed that the flamethrower was in plain view.

**DISCUSSION**

Defendants move to suppress all statements made and all evidence seized after they were illegally detained. According to defendants, the mayor's proclamation of civil emergency imposes no criminal penalties and, as such, law enforcement had no right to question them or search the vehicle. In response, the government argues that defendants were lawfully arrested for "Failure to Comply with an Order or Signal of a Police Officer Regulating Traffic," in violation of O.R.C. § 2921.331. As such, the seizure of the property was incident to a valid arrest. The government also argues that "setting aside the lawful arrest of the defendants...the stop was based on reasonable suspicion."

Upon review, the Court finds that the majority of the statements made to law enforcement, as well as all of the property seized, must be suppressed. As an initial matter, the

Court rejects the government's argument that the arrest of the defendants was lawful. The government does not argue that law enforcement had the authority to arrest defendants directly under the proclamation issued by the Mayor. Rather, the government argues that detectives lawfully arrested defendants for violation of O.R.C. § 2921.331. That statute provides that "no person shall fail to comply with any lawful order or direction of any police officer invested with authority to direct, control, or regulate traffic." In order to sustain a conviction under this provision, the state must prove that defendants acted recklessly in failing to obey a lawful order of a police officer. *See*, *City of Cleveland v. Krebs*, 107 N.E.3d 774, 781 (Oh. Ct. App. 2018). Here, however, there is no evidence that either defendant failed to comply with a lawful order or direction "of any *police* officer." Commander Connelly testified that defendants complied with all commands given to them by the law enforcement officers at the scene. Although the government devotes several pages of its brief to arguing that the Mayor possessed the authority to issue the proclamation, defendants do not dispute this authority. Rather, defendants argue, in essence, that the Mayor is not a police officer. The Court agrees. The proclamation is signed by the Mayor and is on Mayoral letterhead. The government appears to argue that the order "calls on assistance" of police officers and, as such, the proclamation allows for law enforcement assistance to enforce the proclamation. But, the proclamation does not require law enforcement to enforce the proclamation. Rather, it provides that law enforcement officers are "encouraged to assist in preserving the peace." (Doc. 34-1 at Par. D). Thus, to the extent the government is arguing that somehow this paragraph means that the proclamation is an "order of the police," the argument is rejected. The proclamation plainly provides that it comes from the Mayor. The fact that the Mayor encouraged law enforcement to assist in preserving the peace does not transform

7

the proclamation itself into an "order of a police officer."  The government does not argue that either defendant failed or refused to comply with an order given by any law enforcement officer at the scene.  Because the government fails to point to an "order of police officer" disobeyed by either defendant, law enforcement lacked probable cause to arrest defendants.

The government also appears to argue that Long's vehicle was facing the wrong way on a one-way street.  Commander Connelly testified, however, that this traffic violation is not an "arrestable" offense.  Rather, it is subject only to citation.  Moreover both Commander Connelly and the government acknowledged at the suppression hearing that defendants were arrested for curfew violations.  Therefore, to the extent the government is claiming that defendants were lawfully arrested based on the position of the vehicle on the street, the argument is rejected.

At one point, Commander Connelly testified that the searches occurred *before* Long and Poland were arrested.  In other words, the materials found in the vehicle provide a basis for the arrests themselves.  But, Commander Connelly's testimony differs from the incident report and is further internally inconsistent.  Although Commander Connelly testified that defendants were arrested after the plain view search of the vehicle, he also expressly testified that defendants were not free to leave when they were ordered to remain in the frisk position with their hands against the wall. This is further consistent with the government's concession that defendants were "in custody" at this point in time.  In addition, the incident report, which Commander Connelly acknowledges is true and accurate, relates the events in chronological order.  The report indicates that Poland was ordered out of the vehicle and then ordered to the back wall and told to place his hands on the wall next to Long.  Following this event, the reports goes on to identify that the car was visually searched from its open doors.  Based on the report and Commander Connelly's

8

testimony, the Court finds that Long and Poland were arrested before any items were discovered in plain view. This is also fully supported by the testimony at the suppression hearing, which provided that defendants were arrested for curfew violations, not based on the items located during the plain view search. Thus, the items seen in plain view do no support the arrest of the defendants.

Having concluded that the arrests are invalid, so too are the seizures of the property. It is well-settled that the exclusionary rules bars evidence seized pursuant to an unlawful search. *See*, *Brown v. Illinois*, 422 U.S. 590, 601 (1975)(the exclusionary rule is directed at all unlawful searches). Because the government lacked probable cause to arrest defendants, the searches that followed are not valid "searches incident to arrest." Nor does the "plain view" doctrine save the government. The items were only in plain view because the officers ordered Poland out of the vehicle in order to arrest him. Prior to the arrest, the testimony and the report are consistent it was dark and the officers could not determine whether anyone was inside the vehicle. There is no support for an argument that, absent the arrests, the plain view doctrine is applicable. Regardless, the government makes no such argument. Accordingly, suppression of all items seized from the SUV is warranted.

Although slightly unclear, it appears that the government argues that even if the arrests are not supported by probable cause, the evidence need not be suppressed because the searches conducted were the result of a valid *Terry* stop. The Court rejects this argument. As an initial matter, the government itself argues that the searches were done incident to the arrest of the defendants. Even assuming that law enforcement had reasonable suspicion to conduct an initial *Terry* stop, the encounter almost immediately, by the government's own admission, resulted in

9

defendants' arrest.  After stepping out of his vehicle, Long informed Detective Habeeb that he was looking for his wallet.  Detective Habeeb determined that Long would be detained.  He ordered Long to place his hands on the wall and to remain in the frisk position and not move.  Similarly, with respect to Poland, detectives waited for backup to arrive.  Three detectives approached the rear of the vehicle and Poland was ordered out of the SUV with his hands up.  Poland is then patted down and ordered to the wall along with Long.  The Court finds that even if the initial encounter was supported by reasonable suspicion, probable cause was needed once the encounter became an arrest.  *See, United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003).   Here, there is simply no dispute that defendants were arrested almost immediately after the encounter began.  Therefore, although the circumstances may have been sufficient to warrant an initial *Terry* stop, the government exceeded the scope of a *Terry* stop when law enforcement ordered defendants to remain against the wall when they were not free to leave.

In arguing that the encounter was a proper *Terry* stop, the government leaps to the conclusion that "the evidence collected as a result of this appropriate and legally allowed interaction should not be suppressed."  But, the government points to no exception to the warrant requirement that would allow for a wholesale search of the SUV based solely on a *Terry* stop that may be supported by reasonable suspicion, but not probable cause.[1]  The fact remains that, as the government admits, the searches were "searches incident to arrest."  But, lacking probable cause to arrest renders the "searches incident to arrest" improper even if the initial encounter itself may

---

[1] The case cited by the government is easily distinguishable.  *See, United States v. Flores*, 571 F.3d 541 (6th Cir. 2009)(motion to suppress denied where *Terry* stop was proper **and** defendant consented to search of vehicle);

10

have been supported by reasonable suspicion.

The Court notes that, in the reply brief, Long does not contest the admissibility of statements Long made to Detective Habeeb before his arrest. Specifically, Long acknowledged that he was "Brandon," that the SUV belonged to him, and that he was looking for his wallet. These statements, therefore, will not be suppressed.

Long also moves to suppress the It's Not A Flamethrower that was seized at the time of his arrest in Erie, Pennsylvania. The motion is DENIED. During Long's arrest, agents followed Long into the room to allow him to secure his dog. In doing so, agents discovered the item in plain view. SA Kiesel testified that one of the reasons agents confiscated the item is because they did not clear the entire house. As such, other individuals could be located inside the house and the flamethrower could have been used to endanger officers as they retreated from Long's home. Regardless, the item was discovered in plain view during an arrest supported by a warrant. Although defendant Long argues that the item was improperly seized because there is no indication that it was present in Ohio, nor is it illegal to possess the flamethrower, the Court finds that these arguments go to relevancy and not the validity of the search itself. Accordingly, suppression is not warranted.

**CONCLUSION**

For the foregoing reasons, Defendants' Joint Motion to Suppress (Doc. 34) is GRANTED and Defendant Brandon Michael Althof Long's Motion to Suppress Items Illegally Seized Without a Warrant (Doc. 35) is DENIED.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Chief Judge

Dated: 11/16/20